UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MIRACLE HURSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-04890-TWP-DLP |
| | ) | |
| INDIANA GAMING COMPANY LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Cross-Motions for Summary Judgment filed by Plaintiff Miracle Hurston ("Hurston") (Filing No. 244) and Defendant Indiana Gaming Company LLC ("Indiana Gaming") (Filing No. 276). On December 11, 2019, Hurston initiated this lawsuit against Indiana Gaming bringing a number of claims arising out of alleged racial confrontations and incidents involving Hollywood Casino Lawrenceburg (the "Casino"), which is operated by Indiana Gaming (Filing No. 1). After Hurston filed his Fifth Amended Complaint (Filing No. 128), the parties filed Cross-Motions for Summary Judgment on three remaining claims: 42 U.S.C. § 1981 discrimination, breach of contract, and intentional infliction of emotional distress. For the following reasons, the Court **grants** Indiana Gaming's Motion and **denies** Hurston's Motion.

## I.     BACKGROUND

The factual claims in this case are extensive, and this background section provides an explanation of the facts that are relevant to the three claims and the parties cross-motions.

### A.     Procedural Background

On December 11, 2019, Hurston initiated this litigation against Indiana Gaming alleging a number of racial confrontations and incidents involving the Casino's employees and patrons (Filing

No. 1). Hurston asserted claims of race discrimination, breach of contract, harassment, retaliation, conspiracy, and negligence—all under Indiana state law. *Id.* On December 16, 2019, the Court screened Hurston's Complaint, determined that subject-matter jurisdiction was lacking, and allowed Hurston to file an amended complaint (Filing No. 4). On January 21, 2020, Hurston filed his First Amended Complaint, alleging race discrimination under Title II of the Civil Rights Act of 1964, false imprisonment, intentional infliction of emotional distress, breach of contract, harassment, retaliation, conspiracy, and negligence (Filing No. 5). On April 17, 2020, Hurston filed his Second Amended Complaint, removing the harassment, retaliation, and conspiracy causes of action, and adding a claim under 42 U.S.C. § 1981 (Filing No. 17).

On October 26, 2020, the Court granted a motion to dismiss Hurston's claim for violation of Title II of the Civil Rights Act of 1964 as well as his false imprisonment and negligence claims (Filing No. 49 at 23). Hurston's claims for Section 1981 discrimination, intentional infliction of emotional distress, and breach of contract were permitted to proceed. *Id.* Following additional requests to amend his pleadings, on May 12, 2021, Hurston filed a motion for leave to file his fifth amended complaint (Filing No. 113). The Court granted Hurston leave to file his fifth amended complaint, which was filed on June 11, 2021 (Filing No. 128). The Fifth Amended Complaint, which is the operative complaint, brings claims against Indiana Gaming for violation of 42 U.S.C. § 1981, intentional infliction of emotional distress, and breach of contract. *Id.* After the Fifth Amended Complaint was filed, Indiana Gaming filed its Motion for Summary Judgment (Filing No. 244), and Hurston responded with his own Motion for Summary Judgment (Filing No. 276).

**B.    Factual Background**

Indiana Gaming operates the Casino in Lawrenceburg, Indiana. Hurston is an Black male, and from 2017 through 2019, he was a frequent patron of the Casino. Hurston participated in many

gambling activities at the Casino and was considered a "high stakes" player (Filing No. 246-1 at 1–2). Hurston was one of numerous Black males who contributed to the revenue stream of the Casino, but he was the only Black male ranked at the Casino's "Icon" status, based on his regular attendance. (Filing No. 277 at 1). A major part of being Icon status was receiving special privileges and benefits. *Id.*

In 2018 and 2019, Hurston was involved in several loud and disruptive disturbances at the Casino. Many of these disturbances drew a crowd of patrons and would stop gaming operations at the Casino. These incidents included Hurston yelling and cursing at other patrons while they were playing at the Casino. Some patrons complained to Casino management about Hurston's behavior, and management had multiple conversations with Hurston about behaving appropriately at the Casino (Filing No. 246-5 at 2–3).

In the early morning hours of February 14, 2018, Hurston was involved in an altercation with another Black male patron of the Casino. It was noted that disorderly conduct, public intoxication, and simple assault were parts of the altercation. The other patron made snide remarks to Hurston, and during the altercation, Hurston punched the other patron on his head, drawing blood and leaving "goose eggs" on his forehead. Hurston and the other patron did not want each other to be arrested, so neither individual was arrested (Filing No. 271-1 at 2–5). Hurston also informed the officer he would rather nothing come of the incident over getting consequences from the casino. *Id.* at 4.

On April 8, 2018, again during the early morning hours, there was a disturbance on the Casino gaming floor to which management responded. A Caucasian man had forced Hurston out of playing two spots. (Filing No. 262-1 at 2). The Caucasian man called Hurston a punk and the dealer proceeded to deal the Caucasian man a hand. *Id.* When the manager arrived, Hurston was

standing behind a gaming table yelling and cursing at other patrons and an employee.  The manager asked Hurston to go with him, and Hurston began yelling and cursing at the manager, which disrupted Casino operations for several minutes and drew a crowd ([Filing No. 246-8 at 2](); *see also* Hurston's manually-filed video evidence, Exhibit I2, at [Filing No. 265]() and [Filing No. 266]()).  The casino manager had previously been contacted by other Casino guests concerning fears when Hurston is around due to his abusive behaviors while gambling.  [Filing No. 246-8 at 2]().

On December 8, 2018, Hurston was playing blackjack at the Casino, and a waitress served a drink to Hurston.  A verbal altercation arose between the two when the waitress called Hurston a bitch.  Hurston reported the incident, and the same manager who addressed the April 8, 2018 incident showed up at the table to address the situation.  Hurston was removed, and the waitress was suspended from work for three days ([Filing No. 246-1 at 3]()–4; *see also* Hurston's manually-filed video evidence, Exhibit U, at [Filing No. 265]() and [Filing No. 266]()).

Two months later, on February 9, 2019, Hurston was playing on a slot machine when a couple began playing on the slot machine next to him. A Caucasian female blew cigarette smoke in Hurston's face and held her cigarette near his face.  Hurston asked her to stop, and she verbally attacked Hurston and lunged toward him.  A verbal altercation ensued, which drew a crowd as well as security personnel.  The security personnel made Hurston and the other patron involved in this incident leave the Casino ([Filing No. 246-1 at 4]()–5; *see also* Hurston's manually-filed video evidence, Exhibit T, at [Filing No. 265]() and [Filing No. 266]()).  By letter dated February 15, 2019, Hurston was banned from the Casino for thirty days because of his actions on February 9, 2019 ([Filing No. 262-20]()).

Three months later, on May 18, 2019, Hurston tried to withdraw $500.00 from an ATM located inside the Casino.  The transaction went through, and funds were taken out of Hurston's

bank account, but the ATM did not dispense any cash.  Hurston then spoke with Casino employees regarding the issue, and the employees told Hurston that they did not operate the ATM and that he would have to contact the company responsible for the ATM.  Hurston responded that the "situation was some bullshit," and eventually a Casino manager offered to Hurston $150.00 in slot play for his troubles.  Hurston responded that the offer was insulting, and he could "take the free play and shove it up his ass."  (Filing No. 246-1 at 5; *see also* Hurston's manually-filed video evidence, Exhibit V, at Filing No. 265 and Filing No. 266.)  By letter dated May 27, 2019, Hurston was banned from the Casino for one week because of his actions in response to the ATM situation (Filing No. 262-19).

On June 1, 2019, Hurston had a telephone conversation with Rod Centers ("Centers"), the general manager of the Casino.  They discussed at length what had occurred with the ATM situation, and Centers acknowledged how his staff had mishandled the situation.  Centers told Hurston that he would continue to train his staff on how to address various situations, and for the time being, Hurston should directly contact Centers if any additional problems arose, and he would address them for Hurston (Filing No. 246-1 at 6; *see also* Hurston's manually-filed audio evidence, Exhibit C2, at Filing No. 265 and Filing No. 266).

One week after this telephone conversation between Hurston and Centers, on June 8, 2019, a Caucasian patron approached a blackjack table where Hurston and his friend were located, and Hurston's friend asked the patron to wait to join the game because they were on a "hot streak." This individual took issue with the request and asked whether they did not want him to play because he was not black.  Hurston contacted a manager, and the situation was addressed by the other patron not being allowed to play where Hurston had a marker at that time.  Soon thereafter (still on June 8, 2019), Hurston and the Caucasian patron began a verbal altercation at the blackjack

table on the Casino gaming floor.  Hurston got up from the table to go to his room and began walking to the Casino hotel.  The other patron also got up from the table at the same time and followed Hurston to the hotel.  Hurston and the Caucasian patron continued talking during their walk to the hotel, and Hurston occasionally waved on the other patron to follow him when he fell behind him.  At some point during the incident the Caucasian patron stated "I'm not getting on the elevator with a broke nigger with no money."  (Filing No. 262-3 at 2; Filing No. 262-13 at 2). When they arrived at the hotel lobby, Hurston pushed the other patron, and the two jostled elbows while arguing with each other.  Security was summoned to the scene, and after they arrived, they eventually were able to deescalate the situation (Filing No. 246-4 at 7–11; Filing No. 246-1 at 7–8; Filing No. 278-1 at 2; *see also* Hurston's manually-filed video evidence, Exhibit J, at Filing No. 265 and Filing No. 266).

Later that same day, Hurston sent a text message to Centers to explain what had happened and to complain about racism and discrimination. Hurston concluded his text message that racist situations should be taken seriously (Filing No. 262-3). Centers responded that he was out of town, but he would investigate the situation upon his return (Filing No. 246-1 at 8).

On June 13, 2019, Hurston asked Cody Turner ("Turner"), Hurston's Casino host at that time, to reserve a hotel room for him.  Turner did not book a hotel room at the Casino for Hurston because the Casino was "investigating the June 8th 2019 situation," in which Hurston had been involved (Filing No. 246-1 at 8; Filing No. 246-2).  Turner explained that the investigation needed to be completed before booking a room and that Hurston wasn't "banned or anything they just want to straighten this out." (Filing No. 246-2.)

An investigation into the June 8, 2019 incident began that same day (on June 8), and many members of the Casino's management and administration, including Centers, were involved in the

investigation.  The investigation led to the conclusion that Hurston and the other patron engaged in a loud, disruptive, and aggressive altercation had violated the Casino's policies and disrupted safe business operations.  Hurston ultimately was banned from the Casino for one year because of the physical and verbal altercation that occurred on June 8, 2019.  Both Hurston and the Caucasian patron involved in the altercation were banned from the Casino.  Their one-year ban from the Casino began on June 14, 2019.  The June 8, 2019 incident was not the first physical altercation in which Hurston had been involved at the Casino.  Hurston was provided a letter dated June 14, 2019, discussing the one-year ban (Filing No. 246-6 at 2; Filing No. 246-5 at 3; Filing No. 262-7; Filing No. 271-1).

Not yet aware of the one-year ban, Hurston and a friend went to the Casino on June 14, 2019.  When they entered at the Casino, a member of the Casino management approached Hurston and his friend and informed Hurston that he had been banned from the premises for one year because of the June 8, 2019 incident.  Hurston and his friend left the premises after unsuccessfully attempting to get more information (Filing No. 246-1 at 8).  Six months later, Hurston initiated this lawsuit (Filing No. 1).

## II.        SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary

judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has

enough to prevail without a trial.  *Id.* at 648.  "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made."  *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

The Court notes that a "document filed *pro se* is to be liberally construed, and . . . must be held to less stringent standards than formal pleadings drafted by lawyers."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations and quotation marks omitted).

> However, it is also well established that pro se litigants are not excused from compliance with procedural rules. [T]he Supreme Court has never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel[.] Further, as the Supreme Court has noted, in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.

*Loubser v. United States*, 606 F. Supp. 2d 897, 909 (N.D. Ind. 2009) (citations and quotation marks omitted).

### III.    <u>DISCUSSION</u>

In their Cross-Motions for Summary Judgment, the parties ask for entry of summary judgment on Hurston's three claims: Section 1981, breach of contract, and intentional infliction of emotional distress.  The Court will address each claim in turn.

### A.    <u>Section 1981 Claim</u>

Concerning his Section 1981 discrimination claim, Hurston contends that the Casino not only fell short of treating him like a VIP, but treated him less than the average Caucasian guest who attended their establishment. (<u>Filing No. 277 at 1</u>).  He alleges racial motivation was behind his one-year ban from the Casino. Section 1981 provides,

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give

> evidence, and to the full and equal benefit of all laws and proceedings for the
> security of persons and property as is enjoyed by white citizens, and shall be subject
> to like punishment, pains, penalties, taxes, licenses, and exactions of every kind,
> and to no other.

42 U.S.C. § 1981(a).  "[T]he term 'make and enforce contracts' includes the making, performance,

modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms,

and conditions of the contractual relationship."  *Id.* at § 1981(b).

As noted by another judge in this District, "While § 1981 claims are most often brought in

connection with the right to contract for employment, plaintiffs can also use the statute to enforce

their rights to enter into retail contracts." *Carney v. Caesar's Riverboat Casino, LLC*, 2009 U.S.

Dist. LEXIS 10462, at *8 (S.D. Ind. Feb. 11, 2009).

> "In the context of the denial of the right to make or enforce a retail contract, the
> appropriate parallel *prima facie* case is that (1) the plaintiff is of a racial minority,
> (2) he attempted to make or enforce a contract, (3) the defendant denied him the
> right to make or enforce the contract and (4) the defendant treated the plaintiff less
> favorably than other white people who were similarly situated."

*Id.* at *10 (quoting *Williams v. Southern Illinois Riverboat/Casino Cruises*, 2008 U.S. Dist. LEXIS

31309, at *17 (S.D. Ill. April 16, 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973))).  "To prevail [on a Section 1981 claim], a plaintiff must initially plead and ultimately

prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast

Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (U.S. 2020).

The parties do not dispute the existence of the first three elements of a *prima facie* case for

Hurston's Section 1981 claim.  Concerning the fourth element, Hurston argues that Indiana Gaming

denied him the right to contract at the Casino on June 13 and 14, 2019, when it would not book a

room at the hotel and told him the following day to leave the premises because he had been banned.

Hurston argues that these refusals to contract with him were based on his complaint of

discrimination about the June 8, 2019 incident.  He argues that the Caucasian patron who was

involved in the incident already had decided that he would no longer patronize the Casino when the Casino banned him, and when Hurston was involved in a physical altercation with another Black patron in February 2018, the Casino did not ban him from the premises. Hurston asserts that the Casino "clearly denied [him] the right to contract due to him complaining about a Caucasian male being permitted to harass him and make racial slurs" and "[b]ecause [he] reported Discrimination, the Hollywood Casino refused [him] the Right to Contract, and informed him that his issue was under investigation." (Filing No. 277 at 3.)

As noted above, for Hurston to satisfy the fourth element of his Section 1981 claim, he must show that but for his race, the Casino would have allowed him to contract with it on June 13 and 14, 2019.  Indiana Gaming asserts that the admissible designated evidence clearly indicates that not allowing Hurston to book a hotel room or be on the premises on June 13 and 14, 2019, was based solely and entirely on Hurston's history of aggressive, disrespectful, and disruptive behavior in 2018 and 2019 toward other Casino patrons and personnel, which culminated on June 8, 2019, when Hurston had yet another physical and verbal altercation with another patron.  The Casino's denial of Hurston's right to contract had nothing to do with his race and everything to do with his behavior.  Like Hurston, the Caucasian patron who was involved in the altercation was banned from the Casino for one year.  Indiana Gaming asserts, had Hurston's race been different, the result would have been the same—Hurston still would have been banned from the Casino. Thus, his Section 1981 claim fails.

Upon review of the admissible designated evidence, and in light of the controlling case law, the Court agrees that Hurston's Section 1981 claim must be dismissed because he cannot satisfy the fourth element of his claim, and Indiana Gaming has offered a legitimate, nondiscriminatory reason for its actions.  The evidence shows a history of disruptive conduct by

Hurston and the Casino giving him numerous opportunities to correct himself and remain a patron of the Casino.  The evidence shows that Hurston was prohibited from booking a hotel room on June 13, 2019, because an investigation was still being conducted of his physical and verbal altercation that occurred on June 8, 2019.  The evidence shows that Hurston was prohibited from staying on the premises on June 14, 2019, because he had been banned from the Casino because of his physical and verbal altercation that occurred on June 8, 2019.

Hurston's argument that the "Casino's theme of the Plaintiff being a disruptive guest" is pretextual, and "merely an effort the justify discriminatory action taken against Hurston to end the business relationship," also fails. (Filing No. 277 at 8).  A plaintiff can demonstrate that the defendants explanations are pretextual either directly, by showing that "a discriminatory reason more likely motivated" the defendant's actions, or indirectly, by showing the defendants explanations are "unworthy of credence."  *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009).  To show that non-discriminatory explanations are not credible, the plaintiff must point to evidence that the defendant's stated reasons are not the real reasons for the defendants action, have no grounding in fact, or are insufficient to warrant the  decision.  *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (noting that a plaintiff must identify such "weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's asserted reasons that a reasonable person could find them not credible). No such admissible evidence has been designated and no reasonable jury could conclude that Indiana Gaming's purported reason for Hurston's one-year ban was a lie.  The Caucasian patron involved in the same altercation received the same one-year ban from the Casino (it is irrelevant whether that patron decided he was not going to return to the Casino).  Hurston was not treated less favorably than similarly situated white patrons.  The fact that Hurston had not been banned from the Casino more than a

year earlier when he was in a fight with another Black patron does not negate the undisputed fact that he was banned in June 2019 because of his physical and verbal altercation in June 2019.

The evidence shows Hurston was prohibited from contracting with the Casino in June 2019 because of his behavior, not because of his race. Therefore, summary judgment is **granted** in favor of Indiana Gaming on Hurston's Section 1981 claim.

### B.   Breach of Contract

"The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *Berg v. Berg*, 170 N.E.3d 224, 231 (Ind. 2021) (internal citation and quotation marks omitted).  "[W]hether a contract exists is a question of law.  The essential elements of a contract are an offer, an acceptance, and consideration." *Stardust Ventures, LLC v. Roberts*, 65 N.E.3d 1122, 1126 (Ind. Ct. App. 2016) (internal citations omitted). "[A] meeting of the minds between the contracting parties is essential to the formation of a contract. There must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract." *Ind. Dep't of Corr. v. Swanson Servs. Corp.*, 820 N.E.2d 733, 737 (Ind. Ct. App. 2005) (internal citation and quotation marks omitted).

Hurston argues that Indiana Gaming or the Casino entered into a contract with him during the telephone conversation that he had with the general manager (Centers) on June 1, 2019.  He argues that they agreed on a contract to resolve any future disputes involving Hurston and others at the Casino by having him work directly and exclusively with Centers to resolve the problems. Hurston argues that this contract was entered into as a means to retain him as a customer of the Casino and to prevent other actions such as Hurston complaining to the media or bringing lawsuits. He contends that this exclusive dispute resolution with Centers was accepted by him, and there was consideration for this agreement—Hurston would not file police complaints or lawsuits.

13

Hurston asserts that Centers breached their contract when he failed to respond after the June 8, 2019 incident.  He argues that he suffered damages because of "the June 14th, 2019 Breach. [He] had earned his VIP accommodations due to his player rating. Free weekly hotel stays, meals, concerts, gifts, vacations, and a personal host were not things offered to a guest who wasn't at a certain level. These expensive accommodations were lost."  (Filing No. 277 at 34.)

Indiana Gaming argues that there was no contract between the parties, no contract was formed during the telephone call between Centers and Hurston, and there can be no breach because there was no contract. Moreover, Hurston's claimed damages do not flow from any alleged breach by the Casino general manager, because Centers never offered to contract with Hurston.  Rather, the conversation between Centers and Hurston on June 1, 2019, was merely a conversation between a casino patron and a casino employee concerning guest services or guest relations.  There was no manifestation of willingness to enter into a bargain that could give rise to an offer to enter a contract.

Furthermore, Indiana Gaming contends, there were no reasonably certain and definite contract terms to be able to form a contract.  And there was no meeting of the minds regarding an intent to contract. Similarly, Indiana Gaming asserts there was no consideration—or a bargained for exchange—given to support a contract.  Centers simply was cultivating customer relations in the same way he treated all other patrons of the Casino.  Indiana Gaming directs the Court to an affidavit from Centers, wherein he affirms that he did not intend to enter into an agreement or contract with Hurston, and he did not extend any offer to enter into a contract with Hurston. The conversation was one of customer relations and service (*see* Filing No. 246-10).

After reviewing the designated evidence, including listening to the recorded telephone conversation that was designated, the Court concludes that no contract existed between Hurston

and Indiana Gaming to support a breach of contract claim. While Hurston characterizes the telephone conversation as one including an offer and acceptance, Hurston's own view of the conversation cannot create a meeting of the minds or an intent to contract on the part of another person. The designated evidence shows that no offer to contract was extended to Hurston. There was no intent to contract on the part of Centers. Centers simply was trying to keep a customer happy by telling Hurston to contact him if he had problems in the future, and he would do his best to try to fix those problems. The telephone call truly was a customer relations effort, not a contract formation.

The Court further notes that Hurston's contention—that an offer to exclusively communicate with Centers was breached when Centers did not respond after the June 8, 2019 incident—is belied by Hurston's own allegations. Hurston informed the Court that he sent a text message to Centers to explain what had happened on June 8, 2019 and Centers responded that he was out of town, but he would investigate the situation upon his return (Filing No. 262-3; Filing No. 246-1 at 8). The designated evidence does not support the existence of a contract or a breach of contract; therefore, Indiana Gaming is entitled to summary judgment on this claim.

**C.**   **Intentional Infliction of Emotional Distress**

Intentional infliction of emotional distress is committed by one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another. The elements of intentional infliction of emotional distress are that a defendant (1) engages in extreme and outrageous conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another. The requirements to prove this tort are rigorous. Intentional infliction of emotional distress is found where conduct exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. In the appropriate case, an intentional infliction of emotional distress claim may be disposed of by summary judgment.

*Harkins v. Westmeyer*, 116 N.E.3d 461, 472 (Ind. Ct. App. 2018) (internal citations and quotation

marks omitted).

In asking for summary judgment on his claim for intentional infliction of emotional

distress, Hurston points the Court to the follow incidents:

- April 8, 2018, Hurston was removed from the Casino after the verbal altercation near the gaming table, which was addressed by management.

- May 23–July 28, 2018, a Casino employee was recording Hurston's bets, and he was improperly rated, which resulted in him missing his status goal. Hurston complained to management, and the employee again recorded Hurston's bets, after which Hurston called the employee an idiot. Hurston was removed from the Casino after this incident.

- December 8, 2018, Hurston was removed from the Casino after the incident with a waitress.

- February 9, 2019, Hurston was removed from the Casino after the incident with another patron who blew cigarette smoke in his face.

- February 15, 2019, Hurston received a thirty-day ban based on the February 9, 2019 incident.

- May 18, 2019, Hurston had an issue with an ATM, and the Casino staff did not address the issue.

- May 27, 2019, Hurston received a one-week ban based on the May 18, 2019 ATM incident.

- June 8, 2019, Hurston had the verbal and physical altercation with another patron. On June 13 and 14, 2019, the Casino refused to serve Hurston leading to his embarrassment and removal from the Casino.

- June 15, 2019, Casino security supervisor Scott Miller "Liked" a picture of Hurston on Hurston's Facebook page, which resulted in the profile photo of Scott Miller appearing on Hurston's Facebook page.

Hurston argues that "there had been continuous acts of discriminatory treatment that

purposefully got worse after he put management on alert that he felt discriminated against because

of his race." (Filing No. 277 at 10.)  He contends that the above listed actions of the Casino were extreme and outrageous and led to him suffering embarrassment and severe emotional distress.

Indiana Gaming argues that "[t]he 'factual' allegations in Plaintiff's Amended Complaint to support his claim of intentional infliction of emotional distress do not come close to instances of 'extreme and outrageous conduct' which caused him 'severe emotional distress.'" (Filing No. 245 at 22.) The Casino's actions do not "go beyond all possible bounds of decency" as is required by the case law for this claim.  Indiana Gaming points out that Hurston was involved in numerous altercations with other patrons and employees, and his removal from the Casino was an appropriate response to his behavior.  He was always provided appropriate notice and was given opportunities to correct his behavior and return to the Casino.  Indiana Gaming further asserts that there is no evidence that Hurston suffered severe emotional distress to support his claim.

The Court agrees that the Casino's treatment of Hurston concerning the ATM machine incident was handled poorly--and Centers admitted as much during the telephone conversation with Hurston and he apologized that a player of Hurston's capacity was not treated better. But the requirements to prove the tort of intentional infliction of emotional distress are rigorous and do not exist here. *See Westminster Presbyterian Church of Muncie v. Yonghong Cheng*, 992 N.E.2d 859, 870 (Ind. Ct. App. 2013) (citation omitted). Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" *Id*.  It is the intent to harm one emotionally that constitutes the basis for the tort of an intentional infliction of emotional distress. *Cullison v. Medly*, 570 N.E.2d 27, 31 (Ind. 1991).

No reasonable factfinder would find that the Casino's conduct raised by Hurston comes close to "extreme and outrageous conduct" or conduct that "exceeds all bounds usually tolerated

by a decent society" that would lead one to exclaim "Outrageous!" Hurston concedes that he was involved in several altercations and disturbances with Casino patrons (both Black and Caucasian) in 2018 and 2019, and as a result he suffered consequences, including being removed or banned from visiting the Casino for periods of time. He was always provided appropriate notice and was given opportunities to correct his behavior and return to the Casino—including the June 2019 ban which allowed him to return after a period of one year.  Under the circumstances here, the Casino's conduct was not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harkins*, 116 N.E.3d at 472.  Simply stated, Hurston has failed to meet the rigorous requirements to prove this tort.  Thus, Indiana Gaming is entitled to summary judgment on this claim.

## IV.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Indiana Gaming's Motion for Summary Judgment (Filing No. 244), and **DENIES** Hurston's Motion for Summary Judgment (Filing No. 276).  Plaintiff Miracle Hurston's claims are **DISMISSED** on summary judgment, the trial and final pretrial conference are hereby **VACATED**, and final judgment will issue under separate order.  Hurston's pending Motion for Defendant to Pay the Excess Costs, Expenses, and Attorney's Fees Due to Defendant Unreasonably Multiplying Proceedings (Filing No. 251) will be addressed under separate order after entry of final judgment.

**SO ORDERED.**

Date:    11/28/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Miracle Hurston
1812 Grand Avenue
Middletown, Ohio 45044

Catherine A. Breitweiser-Hurst
JOHNSON & BELL, PC
breitweiserhurstc@jbltd.com

Edward W. Hearn
JOHNSON & BELL, PC
hearne@jbltd.com